The next case today is Ana Ruth Hernandez Lara v. Todd M. Lyons, appeal number 19-2019. Attorney Reno. May it please the court, Katherine Reno for the government appellant. I would like to reserve two minutes for rebuttal. You may have it. Petitioner and the district court here ignored the foundation of pre-order release, that it is purely a matter of the attorney general's discretion. Congress granted the attorney general extremely broad discretion to establish the process for determining if individuals and removal proceedings may be released. Forcing the government to carry the burden of proof and imposing a higher standard encumbers this exercise of discretion in an area over which the political branches have almost complete power. Because the district court's decision cannot be reconciled with this by discussing the history of 1226A because I think it's important and it should inform the court's decision. In 1917, the statute initially simply stated that an alien may be released. So that created a circuit split between the 6th Circuit and the 2nd Circuit. The 6th Circuit believing that this established an entitlement to release. The Congress disagreed and in 1949, it developed language to expressly eliminate any presumption of release. And that was in the predecessor to 1226A, which was 1252A. And there, Congress added language to make extraordinarily clear that this was the attorney general's discretion. And the Supreme Court recognized that in Carlson and in Flores. The Supreme Court recognized that Congress eliminated any presumption of release and expressly committed that determination to the attorney general's discretion. The Supreme Court has also recognized that Congress emphatically intended these discretionary decisions to be presumptively correct and unassailable except for abuse. The Supreme Court has repeatedly affirmed the constitutionality of detention pursuant to removal proceedings in cases that had absolutely no individualized review, such as in Damore and in Carlson. And this precedent supports the conclusion that the three layers of individualized review present in 1226A's implementing regulations are constitutional. And recently in Jennings, although Jennings did not involve the constitutional question, the Supreme Court struck down the procedural protections that went beyond those provided in the regulations. In other words, it went out of its way to find that the burden shifting was not required. And even the dissenting justices in Jennings found that bond hearings must take place with regard to the customary rules of proceedings and burdens of proof, not the special rules that the Ninth Circuit had imposed, which included flipping the burden of proof to the courts to examine this issue since Jennings, have not found any constitutional problems with the alien carrying the burden of proof at the initial bond hearing. The Third Circuit in Borobot effectively held that 1226A and its implementing regulations, as interpreted by the BIA, satisfied due process. It stated that Mr. Borobot had received meaningful process before he filed his habeas petition. And the Second Circuit in Velasco-Lopez found no constitutional issues with the initial five minutes remaining. I'm sorry. Go ahead. Go ahead. Even though the petitioner in Velasco-Lopez took issue with his initial bond hearing, that was his primary claim. The Second Circuit did not take any issue with the procedures that were at his initial bond hearing. The procedures, as I mentioned, the three layers of individualized review, plus the fact that the aliens have very wide latitude in the type of evidence that they may submit to the IJ, and the fact that they can request another hearing if the circumstances materially change, this is all sufficient process that complies with the due process clause. Your discussion of the case law in the Third Circuit puzzles me a bit. What about Santos, where they, as I understand it, the court held that even under 1226C, there could be a point where there has to be a bond hearing and the burden would be on the government by clear and convincing. It would seem that if the Third Circuit has held that clear and convincing proof apprised at a 1226 hearing, that a fortiori would apply at a 1226A. Well, Your Honor, in Borbot, the Third Circuit did discuss its decision in German Santos, and there it explained that the reasonableness analysis that it applied in the 1226C context was not applicable in the 1226A context because the 1226C individuals had no process whatsoever, whereas in 1226A, they have an initial bond hearing basically right away from a DHS officer, and then if they're unhappy with that result, then they can seek review from the IJ, and then if again unhappy, to the BIA. So they have multiple layers of review of a decision that 1226A detainee would never get until the 1226A detainee would prove eventually that that individual detention had become prolonged. So again, here, they're given lots of process up front that those 1226A detainees at issue in German Santos were not given at all. I'm sorry, but I don't think that's a satisfactory answer. If the Third Circuit in Santos finds that as a matter of due process, even in the face of a statutory command to the contrary, not only there has to be a hearing, but that due process under those delayed circumstances requires the government to bear the burden. I understand maybe your argument goes to the first point, but it doesn't go to the second point. Well, Your Honor, putting the burden of clear and convincing evidence, that heightened standard, again, that violates the fundamental premise that I discussed earlier, that the Attorney General from Congress has very broad discretion to set up these procedures, and again, the Supreme Court has never held this. The Supreme Court has allowed, for instance, in D'Amour, for detention, it found that that detention was constitutional without any individualized review at all. So that simply is not what you need to prove. Is the logic of your argument that even Matthews doesn't apply? Well, Your Honor, I don't think that we need to get to Matthews because I think, based on the Supreme Court law, that's enough. But assuming that Matthews does apply for the moment, an important consideration in the immigration... Before you make the assumption, what's the basis for the assumption that Matthews does not apply? Because the Supreme Court has again and again upheld the constitutionality of pre-order detention that has been made without any individualized review whatsoever, such as in Carlson and in D'Amour. So here, 1226A provides for lots of individualized review, multi-layer independent individualized review. Okay, so from your point of view, it turns on individualized review as opposed to who has what burden and the standard of proof. Well, due process, Your Honor, is flexible. So yes, it is my position that it always is dependent on the individual circumstance. That's time. Counsel, I don't understand how you talk about Supreme Court precedent that answers the issue we're addressing here. I don't understand how Carlson and D'Amour, which deal with a very different category of immigrant, of an alien, if you will, how those apply here. This is a very different... We're talking about a very different group of individuals, are we not? We are, Your Honor, and I have a two-part response to Your Honor's question. First of all, Congress in 19... Leading up to 1996 and the ERIRA statute that it passed, it did collect lots of evidence. For years, it collected evidence, and it wasn't only about criminal aliens. In fact, Congress found that the failure to detain any aliens was a large problem and was resulting in the INS not being able to do its job of actually removing aliens. So the flight problem absolutely was not limited to criminal aliens. Indeed, in passing the regulations, the INS and DOJ made these observations that it was Congress's mandate. Congress increased the budget in order to increase attention to ensure removal. So flight risk rather than dangerousness, Congress did reach specific findings. Can I... If you don't mind, your sister just told us that the House reference to the Inspector General's report had to do with a high flight risk among those whose requests to remain here had been rejected, and they were... They were not going to appear to be removed. Is there something in the legislative history? I mean, it may be that the House simply mischaracterized the information in front of it. Well, Your Honor, I believe that it was a failure to remove all aliens who were non-detained. So, yes. I'm sorry. What was the basis for that? The only basis that I think was cited was this Inspector General's report. What's the basis? You're the one who just told us you were going to educate us on the legislative history. You have testimony from, I believe, the Manhattan District Attorney's Office, from the head of the INS, and various other witnesses who did articulate this high flight risk. And I'd be more than happy to touch on this again in my rebuttal, Your Honor, recognizing that I am out of time. But just quickly, it would be strange. Congress did develop a lot of evidence to a record of concerns about flight, and it would be strange now for a clear and convincing evidence standard to be imposed, which would, by any calculation, be a much lower standard than existed in 1996. Okay. I had a factual question. Sure. Yes. Does the agency, does your agency currently use any procedures to reduce the likelihood that someone who's out on bond, fleas, for example, ankle bracelets, checking in, things like that? DHS does have that capability, Your Honor. As Your Honor stated, GPS monitoring or other ankle, that is something that ICE can do in certain circumstances. And it would be within ICE's discretion or NIJ's discretion to determine, based on the individual alien circumstances, whether such a measure would be appropriate. We're told that that costs a lot less than incarcerating an alien. Is that correct? I cannot speak to that on personal knowledge, but I have seen reports that do suggest that from DHS. I believe it's their budget reports that do suggest that. And is there any data on what percentage of people who are subject to those conditions actually do flee? I'm not sure whether that data exists, one way or the other, Your Honor. I personally just don't know. Counsel, we've also, we've been told in some of the briefing that, to the extent that a court would order that the IJ might consider alternatives to continued incarceration, detention, alternatives that might assure an individual who's released that they would appear for future proceedings, such as the GPS tracking devices, anklet braces, those kinds of things. That's unrealistic because the IJ functions in the Department of Justice, DHS has responsibilities for detainees independent of the Department of Justice. It sounds to me like you were just saying that the two agencies actually can and do work together without a problem. Are you suggesting that it would, that it is a problem to think that the two agencies could coordinate in dealing with these kinds of alternatives to detention? No, Your Honor, I don't think that is a problem. Your Honor is referring to Eeyore and ICE, is that correct? Yes. I mean, we've been told in the briefing that, to the extent that IJs function within the Department of Justice were to order conditions that might promote that people will appear, that those conditions have to be applied, monitored by DHS. We were told that's a problem. You seem to be saying that's really not a problem. Do I understand you correctly? It certainly imposes an additional burden on the government to have to continuously monitor someone as opposed to if they're detained, obviously they can't flee. Whereas if the government is placing lots and lots of ankle monitors or is responsible for GPS monitoring, many, many people, of course, that would increase the number of resources. So even if the raw numbers may suggest that it is less expensive to use an ankle monitor in one instance, multiplying that exponentially by if that were to be used much more frequently would, of course, increase administrative costs of monitoring all those people and that sort of thing. So I don't know if it's as easy as the raw numbers that Petitioner has submitted may suggest. But that says the more you save, in other words, if the detention costs more than the monitoring, then the more you do, the more you save. Potentially, or the more people have to be hired and paid to monitor these people. So my only point is that I'm not sure it's so simple to use those raw numbers. I miss Reno. Is this something that the judge hearing the bond routinely considers whether there are viable alternatives to detention and is the judge required to consider that as part of the decision? The judge is not required to consider it, although the IJs have extraordinarily wide latitude in what factors they can consider. So they may consider it, but they are not required to. And 1226E would prevent court from imposing or requiring IJs to consider a factor like ability to pay. Because again, Congress gave... No, no, no, no. I wasn't on ability to pay. I was on alternatives to detention, such as the ankle bracelets. Apart from the question of in the position it takes before the immigration judge about the necessity for detention as opposed to these alternatives. I do believe that that is the case, Your Honor. Okay. All right. You have reserved two minutes. Thank you, Your Honor. Attorney Devonshire, if you could please unmute your device. You may proceed. Good morning, Your Honors, and may it please the court. My name is Brianna Devonshire and I represent Petitioner Appellee, Ana Ruth Hernandez-Lara. This case is about an individual who was neither a danger nor a flight risk. Yet when being held pursuant to 1226A, was required to overcome a presumption that she was a danger or a flight risk. And because Ms. Hernandez-Lara bore the impossible burden of proving this negative, she was erroneously detained for 10 months. Because Ms. Hernandez-Lara's removal proceedings are still ongoing today, had the district court not found that her due process rights had been approved by clear and convincing evidence, Ms. Hernandez-Lara would still be locked up today in a Department of Corrections facility alongside convicted criminals. This would have been her 27th month in detention. We are here today to strongly urge this court to affirm the holding of the District Court of New Hampshire. Your Honors, you have to decide one question today, and that is whether due process required the government in this case to prove by clear and convincing evidence that Ms. Hernandez-Lara was either a danger or a flight risk. And the answer here as the district court found is yes. And in this case, we actually have two different avenues this court can use to get to that answer. The first is how the district court decided this case, and that is because Ms. Hernandez-Lara has a significant liberty interest at stake, which is not diminished, the government must bear the burden by clear and convincing evidence. The second argument here is that once Ms. Hernandez-Lara's detention became prolonged, due process required her second volunteering at which the government was required to bear the burden of proof by clear and convincing evidence. Under our first argument, it is crucial to start at the correct starting point, and that is that liberty is the norm and detention is the exception. And we know from the Supreme Court that there are bedrock principles of due process that we can use as guiding posts. The first is that due process places a heightened burden when there is a significant liberty interest at stake that is more significant than the mere exchange of money. The second bedrock principle is that civil commitment for any purpose constitutes a significant deprivation of liberty and requires due process procedural protections. And we know that these bedrock principles apply here in this which held that all persons within the United States are entitled to these bedrock principles, including aliens, regardless of whether they are here lawfully, unlawfully, temporarily, or permanently. So this is our baseline starting point, and this is the due process analysis that Ms. Hernandez-Lara... Counsel, I mean the government responds, and you deal with this in your briefing, but I'd like to hear you deal with it now. I mean the government says, and I think this is the point that we don't even have to get to a Matthews-type analysis, which to some extent you were alluding to, because the Supreme Court has already made it clear that the government can apply rules to immigrants that would not apply to citizens, that a different type of due process analysis is appropriate when we're talking about non-citizens too. So it seems to me you have to be able to persuade us that those pronouncements in Supreme Court decisions, and they're there, do not preclude the type of due process analysis that you're now asking us to do. Yes, Your Honor, and the language in D'Amour that there can be rules applied to aliens that would be unacceptable if applied to citizens, that does not leave limitations on the liberty interests of an alien unreviewable. Even if a rule might be unacceptable, it still has to have constitutional limitations and past constitutional muster. And it doesn't also mean that a rule being... No, no, no. With deference, I think you're avoiding the question. It's not whether it is totally unreviewable. Judge Lopez just said that the Supreme Court has made it clear that the normal rules do not apply in this situation. It would have to be a different type of due process analysis. And yet every case you have cited are to the normal rules. So what is it that under any special due process analysis would say that the existing structure of rules is itself a violation of this special type of due process? Well, Your Honor, there has been no... Five minutes remaining. Thank you. There has been no Supreme Court case that has said that 1226A requires less procedural protections than would be the normal course. Excuse me, that may be true, but the general principles are out there. So I asked you not to make an argument like that because I don't think it works. I think you have to make a different type of argument, perhaps along Matthew's line. I don't know. Sure, Your Honor. And under Matthew's, Ms. Hernandez-Lores' due process rights were still violated even under a Matthew's analysis here. In Matthew's, we're looking at three factors here. We have the private interest at stake, the risk of erroneous deprivation of that interest, and the government's interest. If we look here at the private interest at stake here, Ms. Hernandez-Lores has a significant liberty interest in being free from physical confinement. And her private interest at stake only grew as her And the government has an overwhelming interest in protecting the community from dangerousness, and it has perhaps a lesser interest in preventing flight risk. So what is it about these procedures that the BIA has adopted that increases the risk of erroneous decision making? Yes, Your Honor. And the government does have an interest in keeping the community free from danger. And there's no question about that. But the government has not articulated an interest in detaining an individual who is not a danger or not a flight risk. We have an individual here who is under the broad detention scheme of 1226A. And there has been no finding that there should be a presumption that Ms. Hernandez-Lores is a danger or a flight risk. I don't think presumption is in this case one way or another. I think the question is whether the procedures used, given present circumstances, are going to lead to erroneous decisions. Yes, Your Honor. And we see that that happened in this case here. Ms. Hernandez-Lores was required at her initial bond hearing to prove that she was not a danger or a flight risk. Ms. Hernandez-Lores came to the bond hearing. She does not speak English. She has never attended school. She had very limited access to resources. Yet even with those obstacles, she came and she presented evidence to the immigration judge that she had no criminal history, no arrest history, had good moral character, ties to the community. And even then, the government produced a red notice saying that she had affiliations with two rival gangs. Ms. Hernandez-Lores explained to the immigration judge why she thought this red notice could have any applicability to her, and not that she had any involvement with any gangs, but that her brother did. And this explanation was not sufficient. Importantly here, the immigration judge found that it was because Ms. Hernandez-Lores could not meet her burden in showing that she wasn't a danger or flight risk that she was detained. If you look at the language from the immigration judge, the immigration judge never actually found that Ms. Hernandez-Lores was a danger or a flight risk. He just found that because this presumption exists that she is a danger or flight risk, she cannot meet that burden. And we see the prejudice that resulted in the burden being on her in the first hearing. If I could interject and ask it this way, this gets to sort of what Judge Lynch was trying, was getting at. If we assume that for a United States citizen, the government wouldn't be able to stick them in a cell for months on end without proving, carrying a burden of proving a factor that would require them to do so. And then if we also assume that immigrants have many, but not all the constitutional rights that a citizen has, so that you can't automatically infer a rule for a citizen applies to a rule for an immigrant. And it seems to pose the question, should this, the rule that you want us to impose, the burden shifting and the clear convincing evidence, is that one of those rules that applies to citizens and immigrants alike? Or is it one of those rules that doesn't apply to citizens? And how should we go about thinking about that question? It doesn't apply to immigrants. Yes, Your Honor. And I think in this 1226A context that we're in, without any indication... That's time. Answer the question. Go ahead. Without any indication otherwise, we have to start with the baseline of due process rights. And the due process cases that we cite, cite freely between immigration cases and other civil cases. And the Supreme Court has never distinguished between the immigration liberty interest at stake in being deprived of immigration status and the citizens liberty interest at stake when they are confined. In addition, we have the bedrock principle from Zedvidas that due process applies to all persons in the United States, including aliens, whether they are here lawfully or unlawfully. Okay, so you assert the immigration judge made an error here, that the red notice wasn't enough to... Or she didn't show that the red notice wasn't enough to make the immigration judge worried that she was a gang member and a danger to the community. Okay. But there is an error correction procedure already in place. If the federal district court denies bail, they go to the court of appeals and there are error correction mechanisms already in place. And so in light of that, what is it about the BIA procedures, which so as to burden and quantity of evidence, who has a burden and what they have to prove that violates the due process clause? Yes, Your Honor. The immigration judge even questioned the validity or the sufficiency of the red notice in the hearing. She found that, I don't find that this is sufficient enough to show what she's being accused of. And because of that, Ms. Hernandez-Lora can't overcome this burden. The burden shifting in her second bond hearing shows exactly what prejudice resulted from the burden being on her in the first hearing. That red notice, once the burden was shifted onto the government, was not sufficient to show that she would be a danger. And specifically here, Ms. Hernandez-Lora was detained for 10 months. And then at the second bond hearing, the government had 10 months. And in the meantime, her asylum proceedings were ongoing. And in 10 months, it was not able to come with anything more to show that there was that Ms. Hernandez-Lora was a danger of flight risk. There's no question here that Ms. Hernandez-Lora was not a danger of flight risk. And her situation shows exactly what happens when the burden shifts onto the government. Counsel, as a matter of sort of routine, how much time elapses between a decision by an IJ, and then if the petitioner wants to then go to the BIA? What kind of, the government describes these layers of review as responsive to the due process concerns? And maybe that is true with respect in some limited way to error correction, but just in terms of prolonging the period of petition, how much time elapses routinely between the IJ decisions and then BIA proceedings? I'm sorry, can I get clarification? Do you mean bond proceedings or merits proceedings? Merits proceedings is what we were talking about. Your Honor, I'm not quite sure the average length that would, for this situation, or the average length when that happens. Ms. Hernandez-Lora's remote proceedings are still ongoing, and this is the 27th month. One of the issues with the procedures in place that the government argues are sufficient is that these are all administrative reviews in which the detainee bears the burden. If the issue here was the burden being on the government, excuse me, on the alien, then not shifting that burden is not going to address the problem of an individual who is not a danger or a flight risk suffering prejudice by going into a bond hearing with the assumption that she is a danger or flight risk. If there are no further questions, we strongly urge this court to affirm the District Court of New Hampshire's holding. I had one technical question. Do you have any prediction as to when the proceedings will be over completely? We don't at this point, Your Honor. The BIA still has it and has the case and will likely be going to the immigration court, and there will be another hearing, but there's no process. Thank you. Does the government have two minutes now? Yes, Judge. Okay. Thank you, Your Honor. I would like to take a moment to point out that the district court failed to recognize that immigration is different, and in immigration, the government's plenary authority is at its zenith, and there are three reasons why the civil commitment cases do not apply in the immigration context. First is the right to be in the United States, so a person who's civilly committed generally is a U.S. citizen who has a right to be here and to be detained during removal proceedings. Petitioner here has conceded that she has no legal right to be in the United States. She also has no right to be at liberty here. Also, civil commitment is potentially permanent, whereas detention during removal proceedings, it always ends. The removal proceedings will end, and as has been mentioned, the government expedites detained cases. And finally, civil commitment is involuntary. The state would prohibit someone from leaving a mental hospital, and that person would have absolutely no option but to remain in the hospital. Here, in detention during removal proceedings, the alien can voluntarily return home or choose not to seek continuances to speed the case along. Now, those are, of course, difficult choices to make, but the Supreme Court in De Moore recognized that sometimes aliens do have to make those choices. And in De Moore, in rebutting Justice Souter's dissent, the majority implicitly found that these civil detention cases were not applicable in light of Congress's broad power over immigration naturalization. Even in Zadvidas, which involved the potentially permanent detention of an alien with a final removal order, the Supreme Court placed the burden on the alien. And briefly, with regard to the Matthews analysis, again, immigration is different. As the Supreme Court recognized in Landon v. Plasencia, courts must weigh heavily that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and legislature. So, counsel, are you saying that Matthews simply should not apply, or somehow in the Matthews balancing analysis, the status of the individual as a non-citizen affects the way in which the Matthews analysis should be done? Which are you saying? The latter, Your Honor. So, if this court finds that Matthews does apply, it simply must keep in mind that this is within the context of immigration. And so... And how does that play in? Where is... I guess you're suggesting that sort of the third step of Matthews, that the government's interest in burdens should factor more heavily? Is that how you see it differ? Yes, Your Honor. As Damore recognized, the government need not use the least burdensome means to accomplish its goal to comport with due process. And I know my time is up, Your Honors. I'd be happy to answer. Well, yes. I'm asking my colleagues if they have any further questions. What happens to Ms. Lara if we were to reverse? If Your Honors were to reverse, she could be re-detained. She could be what? I didn't hear you, counsel. The government would be able to re-detain her. On what basis? On the basis that she is a removable alien with no lawful status in this country as she has conceded. No, but I thought a decision had been taken that she was not dangerous at the second hearing. Are you saying that even under continuation of all of the present facts, the government would go pick her up? I'm saying the government could, Your Honor. I don't know what ICE would or would not do in this situation. I wouldn't want to speak for ICE. But on what basis? Again, on the basis that she is an alien who has no lawful status in this country and therefore could be detained under 1226A because her prior bond hearing had the wrong standard and burden of proof. The government was forced to carry the burden of proof. Wouldn't the government have to show that it actually suffered some prejudice before it went off and did this? Well, not necessarily. Well, I guess I suppose it could because initially at her bond hearing, the immigration judge decided that she should be detained. So there's the prejudice right there, a different result. Yes, but there was different evidence the second time around, I believe. My understanding, Your Honor, was that the evidence was the same both times. The government introduced the red notice and the petitioner introduced some criminal background searches from Texas and Maine, as well as some letter from her landlord and some character references and some mail showing that her boyfriend lived at the address that she listed in Maine. And I do believe that no different evidence was introduced in the second hearing. Well, you know, I have to say that answer makes me a bit worried. Is there anything I can answer to help, Your Honor? Any further questions? No. Because the existing procedure satisfied due process, this court should reverse the district court's decision. Thank you very much, Your Honors. Thank you. Thank you. That concludes argument in this case. Attorney Reno and Attorney Devonshire, you should disconnect from the hearing at this time.